UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

ALEX GOLDMAN,

                        Plaintiff,

           -against-

CATHERINE REDDINGTON,

                   Defendant.

-------------------------------------------------------- x

Case No. _____

**COMPLAINT**

Plaintiff ALEX GOLDMAN ("Plaintiff" or "Mr. Goldman"), by and through undersigned counsel Gottlieb & Janey LLP, as for his Complaint against Defendant CATHERINE REDDINGTON ("Defendant" or "Ms. Reddington") alleges as follows:

## NATURE OF THE ACTION

1.     This is an action for damages arising out of Defendant's pattern and campaign of aggressive public harassment and making knowingly false statements against Plaintiff in an attempt to, *inter alia*, devastate Mr. Goldman's educational and career prospects; destroy his personal relationships with members of the community; destroy his academic relationship with institutions of higher education; destroy his employment opportunities; publicly tarnish his reputation; and wreak havoc on his personal life and that of his family.

2.     In the past few weeks, in particular, **Defendant has made numerous posts on social media platforms Facebook and LinkedIn falsely accusing Mr. Goldman of sexual assault and stating that he is a "rapist."** These posts by Defendant included a picture of Mr. Goldman and "tagged[1]" Mr. Goldman's employer and the university where Mr. Goldman attends

---

[1] The definition of "tagged" according to Merriam-Webster dictionary is "to supply (something, such as a social media post) with a hashtag #."

college. These vicious accusations were knowingly false and intentionally made. These social media posts have been viewed and "liked" by thousands of people.

3.      Mr. Goldman has been irreparably harmed by these public false allegations of sexual assault and rape. When the Defendant reported the purported incident of sexual assault to the local police in May 2017, upon a full investigation, neither the police department nor district attorney's office found any evidence whatsoever to support these allegations and memorialized that position in writing in November 2017. Nevertheless, the Defendant has not only persisted in her allegations but has become more vociferous in her baseless and knowingly false accusations.

4.      Mr. Goldman seeks damages and injunctive relief to remedy the emotional, mental, and economic harm caused by Defendant's knowingly false statements. There is simply no evidence that Mr. Goldman sexually assaulted Defendant. Accordingly, there is no "truth defense" to the defamation claim here.

5.      In April 2017, Defendant and Mr. Goldman were students at Syracuse University ("Syracuse"). On April 22, 2017, Defendant attended a party at the Delta Kappa Epsilon ("DKE") fraternity house. Mr. Goldman was a member of DKE and resided in a room in the fraternity house. Ms. Reddington spent the night in Mr. Goldman's room. Both Mr. Goldman and Ms. Reddington recall waking in Mr. Goldman's room on the morning of April 23, 2017 fully clothed. Neither Ms. Reddington nor Mr. Goldman recalled what occurred the night before.

6.      Nonetheless, on April 24, 2017—26 hours after leaving Mr. Goldman's fraternity house—Defendant went to Crouse Hospital to complain of a possible sexual assault. At that time, a Sexual Assault Nurse Examination ("SANE") was conducted, and during the course of the examination Ms. Reddington stated: "I think I might have been drugged because I don't remember much." The SANE produced no evidence to corroborate a sexual assault; no evidence

of any intoxicants in her bloodstream other than caffeine and marijuana; and DNA analysis of Ms. Reddington's vagina was negative for male DNA.

7.      Ms. Reddington stated to numerous individuals that she did not recall the events of the night of April 22, 2017 and the morning of April 23, 2017.  This included statements to nurses at Crouse Hospital during the SANE; her friends in the days following the alleged occurrence, as reflected in witness statements; Detective Michael Bates ("Detective Bates") from the Syracuse Police Department ("SPD"); Assistant District Attorney Maureen Barry ("ADA Barry") of the Onondaga County District Attorney ("OCDA"); and Syracuse University Title IX Investigator Bernerd Jacobson ("Investigator Jacobson").  To all of these parties Ms. Reddington stated, in sum and substance, that she had no recollection of what happened that night.

8.      Nevertheless, Ms. Reddington has persistently made knowingly false statements, including repeatedly stating Mr. Goldman is a "rapist."  It is not mere speculation that Ms. Reddington's statements were knowingly false, but rather based on the evidence: Ms. Reddington's numerous statements that she did not recall what happened that night **AND** the detailed and thorough investigation by Detective Bates of the SPD and ADA Barry of the OCDA.  ADA Barry has definitively stated: "[t]here is no corroborating evidence to support allegations of a sexual assault....There is also no physical evidence from the SANE to corroborate a sexual assault."  A copy of the OCDA report issued by ADA Barry is annexed hereto as *Exhibit A* and incorporated herein by reference.  ADA Barry concluded: **"After a full and thorough investigation by our office and the detectives with the Syracuse Police Department, it is impossible to determine what, if anything, occurred that evening between Ms. Reddington and Mr. Goldman.  There is no credible proof of any sexual conduct in this case, consensual or non-consensual.  As a prosecutor sworn to pursue justice, it would be**

-3-

unethical for me to charge Mr. Goldman with a crime based on these facts and circumstances." *Exhibit A* (emphasis added).

9.      Despite the lack of any evidence whatsoever of sexual assault, Defendant has continued and continues to make knowingly false statements regarding Mr. Goldman and branding him a "rapist" and a "monster."

10.      In or about June 2017, the Defendant filed a complaint with Syracuse University, which, in turn, conducted its own Title IX investigation, pursuant to Syracuse University's Code of Student Conduct.  Upon information and belief, the Defendant also told Syracuse University that the Plaintiff sexually assaulted her, and this accusation was knowingly false when made.

11.      Despite Defendant also telling Syracuse Investigator Jacobson that she has no memory of entering Mr. Goldman's room the night in question or any recollection about anything that followed until she woke up the next morning, Syracuse University expelled Mr. Goldman.

12.      Following Mr. Goldman's expulsion from Syracuse University, Defendant celebrated Mr. Goldman's expulsion by going to the DKE fraternity house bragging to Mr. Goldman's friends and fraternity brothers that her "rapist" was expelled.  In fact, she texted at least two of Mr. Goldman's friends following Mr. Goldman's expulsion calling him a "violent rapist" and "monster."

13.      *Nonetheless*, Defendant was not satisfied with her false report to Syracuse University, Mr. Goldman's subsequent expulsion, or branding Mr. Goldman as a "rapist" to members of the Syracuse University community.  Beginning in **June 2018**, Defendant initiated a systematic process of **publicly and falsely accusing Mr. Goldman of criminal conduct— despite the OCDA and SPD finding of no evidence whatsoever to support a claim for sexual assault**.  More particularly, Defendant made social media posts calling Mr. Goldman a "rapist"

-4-

and waging a campaign to have Mr. Goldman expelled from his *new* college, New Jersey Institute of Technology ("NJIT"), and fired from his summer internship at Bohler Engineering ("Bohler").

14.     On June 5, 2018, Mr. Goldman was, in fact, fired from his summer internship at Bohler Engineering based on her knowingly false statements directed to Bohler—her 2 social media posts on June 4, 2018 in which she "tagged" Bohler and her direct message to Bohler on June 5, 2018.   Following Bohler's notification to Ms. Reddington that Mr. Goldman's employment with Bohler was being immediately terminated, Ms. Reddington posted a copy of her communications with Bohler and bragged about her accomplishment.

15.     In other words, the social media posts published by Defendant against Mr. Goldman were intentionally directed to Mr. Goldman's family, friends, community, university, current employer, prospective employers, as well as the general public via social media.   These statements by Defendant were widely disseminated over the internet and viewed by thousands of people.   These statements were false when made and Defendant knew they were false—based on her repeated inability to recall the events of the night in question and the findings of the SPD and OCDA investigations—but made them in order to cause harm to Mr. Goldman.

16.     As Defendant well knows, and as the evidence will demonstrate at trial, neither Ms. Reddington nor Mr. Goldman could recall the events of the night of April 22, 2017 and the early morning of April 23, 2017.   There was unequivocally no evidence of sexual assault or rape. Defendant Reddington's allegations are utterly unfounded and she knew them to be false when she made them.

17.     Plaintiff initiates this lawsuit in a prayer for relief that, *inter alia*, the Court enjoin Defendants' egregious conduct that is actively causing irreparable damage to Mr. Goldman's educational and career prospects, as well as personal reputation.

## PARTIES

18.     Plaintiff Alex Goldman is a natural person who, at all relevant times, was over the age of 18 and resides in Essex County, New Jersey.

19.     Defendant Catherine Reddington is a natural person who, at all relevant times, was over the age of 18 and resides in Nassau County, New York.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1332 (diversity), as Plaintiff and Defendants are residents of different states, New Jersey and New York, respectively, and as the amount of damages at issue exceeds $75,000.00 (seventy-five thousand dollars) exclusive of interest and costs.  To wit, Plaintiff alleges damages to be established at trial of at least $5,000,000.00 (five million dollars).

21.     This Court has personal jurisdiction over the Defendant because she is a resident of New York State and because her conduct giving rise to this Complaint was directed toward and had an effect in New York State.

22.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(1), as the Defendant resides in this judicial district.

## FACTS

### A. Mr. Goldman's Background

23.     Alex Goldman was born and raised in West Orange, New Jersey.  Mr. Goldman graduated from West Orange High School in 2014.  Following high school graduation, Mr. Goldman matriculated at Syracuse University.  Mr. Goldman studied civil engineering and was enrolled in an accelerated program for his Master's in Business Administration ("MBA")—an extremely selective program in which only six students in the class were admitted.  Mr. Goldman

maintained a 3.1 GPA and was on track to graduate with his bachelor's degree in 2018 and an MBA in 2019.

24.     During his time at Syracuse, Mr. Goldman became a member of the Syracuse University chapter of the Delta Kappa Epsilon fraternity.  From Fall 2015 to Fall 2017, Mr. Goldman resided in the DKE fraternity house located at 703 Walnut Avenue, Syracuse, New York 13210.  In Spring 2016, Mr. Goldman was elected president of the Syracuse University chapter of the DKE fraternity.

25.     At the time of the alleged incident—April 22-23, 2017—Mr. Goldman was a junior at Syracuse University.  Mr. Goldman was only seven credits shy of graduation at the time of his expulsion in November 2017.

26.     Following Mr. Goldman's expulsion from Syracuse University, Mr. Goldman moved back to West Orange, New Jersey.  Mr. Goldman then enrolled at New Jersey Institute of Technology.  Mr. Goldman also obtained an internship at Bohler Engineering for the summer of 2018.

27.     Mr. Goldman has no criminal history and has never been arrested.

**B. *Night of April 22, 2017 -- Morning of April 23, 2017***

28.     On April 22, 2017, DKE was hosting a joint party with the Kappa Kappa Gamma ("KKG") sorority; Ms. Reddington was a member of KKG and a participant at the party.  The event was scheduled to begin at approximately 11:00 p.m.  Ms. Reddington and other women from KKG sorority arrived a few hours early to "pregame[2]" in a room on the second floor of the DKE fraternity house.  Both Ms. Reddington and Mr. Goldman consumed alcohol during the pregame.

---

[2] The definition of "pregame" according to Merriam-Webster Dictionary is "to begin drinking alcohol before an event or activity (such as a party or a night out)."

29.     After participating at the "pregame" for approximately two hours on the second floor, both Mr. Goldman and Defendant went downstairs to the party where alcohol was also being served.  Surveillance video from the DKE house shows that at approximately 12:30 a.m. on April 23, 2017, Ms. Reddington followed Mr. Goldman to his room.  Surveillance video further shows Ms. Reddington a few feet behind Mr. Goldman and entering his room.

30.     Both Mr. Goldman and Ms. Reddington awakened later in the morning, on April 23, 2017, in Mr. Goldman's room fully clothed and with no apparent recollection of what had occurred after midnight.  Surveillance video shows Ms. Reddington leaving Mr. Goldman's room at approximately 10:30 a.m. in no apparent distress.

*C.  Syracuse Police Department and Onondaga District Attorney's Office Investigation*

31.     Following Defendant's complaint that she may have been sexually assaulted, Detective Bates from the SPD and ADA Barry from the OCDA were assigned to investigate. Detective Bates first interviewed Ms. Reddington on May 1, 2017 at which time she stated "halfway through the night, she 'blacked out' and doesn't remember anything after 12:30 a.m. on April 23, 2017."

32.     *Again* on May 4, 2017, Detective Bates interviewed Ms. Reddington to see if she could recall any other events on the evening in question and she stated that she could not. Subsequently on May 10, 2017, she was *again* interviewed by Detective Bates and shown the surveillance video from the hallway of the fraternity house and stated that she "did not recall going to Mr. Goldman's room" and did not know what happened after midnight of the night in question.

33.     Detective Bates later received the forensic toxicology report from Crouse Hospital taken from Ms. Reddingotn's urine sample on April 24, 2017.  That report indicated that the only

items present in her bloodstream at the time of the analysis were caffeine and marijuana and no other drugs or intoxicants were detected.

34.     Based on the lab results showing no indication of any incapacitating drugs in her system, the fact she had no recollection of the events of the night in question, and no physical evidence of sexual assault, SPD closed this case as Detective Bates believed there was no evidence that a sexual assault occurred.  Detective Bates forwarded his report to ADA Barry.

35.     ADA Barry subsequently issued her own report based on the investigation by OCDA and SPD, including interviewing Ms. Reddington, reviewing all police reports and medical records of Ms. Reddington, and reviewing results of the SANE.  *Exhibit A*.  The report conducted by ADA Barry stated: "there is no corroborating evidence to support allegations of a sexual assault….there is also no physical evidence from the SANE to corroborate a sexual assault." *Exhibit A*.  ADA Barry also stated that DNA analysis following the SANE resulted in negative results for male DNA.  *Exhibit A*.  Furthermore, ADA Barry wrote that "Ms. Reddington has stated repeatedly that she has no direct knowledge of any sexual acts that she may have engaged in with Mr. Goldman." *Exhibit A*.  Lastly, ADA Barry stated:

> Ms. Reddington's lack of memory and the lack of any witnesses to this incident make it impossible to prove that she articulated an unwillingness to act upon any sexual conduct that may have occurred…I have personally reviewed all of the evidence in this case.  **After a full and thorough investigation by our office and the detectives with the Syracuse Police Department, it is impossible to determine what, if anything, occurred that evening between Ms. Reddington and Mr. Goldman.  There is no credible proof of any sexual conduct in this case, consensual or non-consensual.  As a prosecutor sworn to pursue justice, it would be unethical for me to charge Mr. Goldman with a crime based on these facts and circumstances.**

*Exhibit A* (emphasis added).

#### D. *Syracuse University's Title IX Investigation*

36.     On July 10, 2017, Mr. Goldman received notification that Syracuse University was conducting its own Title IX investigation pursuant to Syracuse University's Code of Student Conduct.   This investigation was led by Investigator Jacobson.   Ms. Reddington initially informed Investigator Jacobson that she had no memory of entering Mr. Goldman's room that night and anything that followed until she awakened several hours later.   However, weeks later Ms. Reddington asserted that she began to experience sudden flashes of memories following a visit to a therapist and miraculously was able to describe fragmented memories of having sexual intercourse with Mr. Goldman and being sodomized by Mr. Goldman without her consent.

37.     Despite any supporting medical or physical evidence, Investigator Jacobson credited Ms. Reddington's contrived recollection.   Syracuse University determined that Mr. Goldman violated the Student Code of Conduct and in November 2017 expelled him.

#### E. *Defendant's Knowingly False Statements To Others*

38.     Defendant has made knowingly false and defamatory statements about Mr. Goldman to other Syracuse University students.   On November 17, 2017, Ms. Reddington contacted Thomas Aiello, a friend of Mr. Goldman, via text message, following Syracuse University's decision to expel Mr. Goldman.   During this text message conversation, Defendant repeatedly referred to Mr. Goldman as "violent" and branded him a "violent rapist."   A copy of this text message conversation is annexed hereto as ***Exhibit B***.

39.     Furthermore, in May 2018, Ms. Reddington contacted Dennis Kadric, another friend of Mr. Goldman, via text message.   During this text message conversation, Ms. Reddington repeatedly referred to Mr. Goldman as a "monster" based on her false claims of sexual assault.

40.     These text messages are rife with outright lies and extremely disparaging accusations of criminality and damaging to Mr. Goldman's reputation.

**F. *Defendant's Knowingly False Statements Via Social Media***

41.     In **June 2018**, in an effort to further destroy Mr. Goldman's reputation, as well as educational and career prospects, Defendant began a series of social media posts continuing to falsely brand Mr. Goldman as a "rapist" and falsely claimed that she was the not the first person Mr. Goldman had sexually assaulted.

42.     On **June 4, 2018 at 7:44 p.m.**, Defendant posted on Facebook with her location at NJIT—Mr. Goldman's new college—a three page post which is annexed hereto as ***Exhibit C***.  In pertinent part, Ms. Reddington wrote:

> **During the early hours of April 23, 2017 I was raped and sodomized.  I woke up in Delta Kappa Epsilon Fraternity in Alex Goldman's bed confused, bloody, bruised, with ripped clothing and splinter.**  I went to the police only to be asked if I had ever engaged in rough sex prior to my rape, and my friend to be asked if I slept around.  I never slept around, in fact, I have never had a once night stand in my life.  Not that that should matter as rape is an act of violence, not sex.

*Exhibit C* (**emphasis added**).  In the same post the Defendant also wrote:

> My motive is to try to stop him from ruining another person's life, as this will not be the last time.  He is a predator.  He didn't have to rape and sodomize me.  He didn't have to do any of this.  This more than just seeking justice; this is seeking prevention.  I completed an entire two semesters at the school where my rapist was expelled from, one of which he was there for, but to this day he continues to walk free.  **My rapist has an internship with Bohler Engineering and will be graduating from a different college, New Jersey Institute of Technology.  I have had multiple individuals that have approached me, expressed their knowledge of Alex Goldman's track record.  Alex Goldman is a rapist.  I write this post because this is not the first time Alex Goldman has raped someone and I want to make sure that it is the last.**

*Exhibit C* (**emphasis added**).    She    concluded    the    post    with    "#MeToo #NewJerseyInstituteofTechnology #NJIT # Bohler Engineering" with a link to Mr. Goldman's Facebook profile, his LinkedIn profile, and a picture of Mr. Goldman. *Exhibit C*. Thousands of people viewed this Facebook post, as evidenced by the more than eleven hundred "likes", two hundred and ninety three "shares," and more than one hundred "comments." *Id.*

43.    The Facebook post received comments such as: "[h]opefully they'll catch this animal.  I will share this posting in hopes that someone out there who knows him sees it…." and "…Everyone within the Bohler ecosystem should know that their future leadership consists of a current rapist.  They should read this and know that they are empowering a monster…." *Id.*

44.    On the same date, **June 4, 2018**, Ms. Reddington posted an almost identical post on social media platform LinkedIn, in which she once again referred to Mr. Goldman numerous times as a "rapist." A copy of Defendant's post on LinkedIn is annexed hereto as *Exhibit D*.  In a portion of the post after stating "Alex Goldman is a rapist" she wrote:

> While I am proud to say I got my rapist expelled from Syracuse University, on November 15, 2017, he now attends New Jersey Institute of Technology where he is on track for graduation. Clearly my school officials saw something wrong enough with him to remove him permanently from my university, however, our law enforcement continues to allow him to walk the streets.  While I tried doing this "the systematic way", this monster is free and should be behind bars.

*Exhibit D.* She concluded the post by tagging "New Jersey Institute of Technology; Bohler Engineering; #MeToo." *Exhibit D.*

45.    On **June 5, 2018**, Ms. Reddington directly contacted Bohler Engineering via the direct message feature on Facebook, a copy of which she posted on Facebook.  A copy of Ms. Reddington's communications with Bohler and Facebook post is annexed hereto as *Exhibit E.* While she only published a portion of what she stated to Bohler, it is clear she contacted Bohler

with a specific purpose—to harm Mr. Goldman's career prospects. The portion of her message to Bohler reads: "…syracuse did when they deemed him dangerous and expelled him. Thank you for your time." *Id.* Although her full statement to Bohler is not publicly available, upon information and belief, she clearly reiterated her false statements and recounted that Syracuse University expelled Mr. Goldman and urged Bohler to do the same.

46.     Defendant then posted on Facebook the entirety of Bohler's response: "Thanks for messaging us. We try to be as responsive as possible. We'll get back to you soon." *Id.* Bohler subsequently followed-up at 4:38 p.m. on that same date and stated: "Thanks for the message. Due to the severity of the allegations and our zero tolerance policy, we have elected to immediately terminate the employment relationship." *Id.*

47.     On **June 5, 2018 at 4:48 p.m.**, Ms. Reddington reposted Bohler's message in celebration and stated: "**Thank you to everyone for reposting and spreading the word on the monster that Alex Goldman is. Thank you to Bohler Engineering for taking a stand against this disgusting excuse of a man. Alex Goldman has now lost his position at Bohler Engineering. --☺ feeling happy**." *Exhibit E* **(emphasis added)**. Hundreds of people viewed this Facebook post, as evidenced by the more than three hundred and sixty "likes" and thirteen "comments." *Id.*

48.     This Facebook post received comments such as: "This person needs to be off the streets" and "…he will get his, it's only the beginning!!!!" *Id.*

49.     More recently, on **June 6, 2018 at 1:48 a.m.**, Defendant posted on the Facebook page for NJIT—Mr. Goldman's new college—the following under the reviews section: "A school that accepts recently expelled rapists, despite it being marked on their transcript." A copy of Defendant's post on NJIT's Facebook page is annexed hereto as *Exhibit F*.

50.     Defendant's social media posts are endeavoring to inflict maximum harm on Mr. Goldman—to his educational prospects, career prospects, and reputation.

## AS FOR A FIRST CAUSE OF ACTION
## DEFAMATION- LIBEL *PER SE*

51.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs (1-50) as if set forth at length herein.

52.     Under New York law, a cause of action for defamation requires the following elements: "1) a false statement, and 2) publication of it to a third party, 3) absent privilege or authorization, which 4) causes harm, unless the statement is defamatory *per se*, in which case harm is presumed." *Jacobus v. Trump*, 55 Misc. 3d 470, 474 (Sup. Ct. New York County 2017).

53.     Generally, spoken defamatory words are slander; written defamatory words are libel. *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001). **Social media posts are actionable as libel**. *E.g.*, *Torati v. Hodak*, 147 A.D.3d 502, 504 (1st Dep't 2017) **(emphasis added)**.

54.     A statement constitutes libel *per se* if it "tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or [to] induce an evil opinion of him [or her] in the minds of right-thinking persons[.]" *D'Amico v. Correctional Medical Care, Inc.*, 120 A.D.3d 956, 962 (4th Dep't 2014) (citation omitted).

55.     Libel *per se* includes "a statement that suggests improper performance of one's professional duties," or "[r]eputational injury to a person's business…that either imputes some form of fraud or misconduct or general unfitness, incapacity, or inability to perform one's duties." *Jacobus*, 55 Misc. 3d at 480 (citations omitted). Libel *per se* also includes "a false report accusing the plaintiff of a serious crime." *D'Amico*, 120 A.D.3d at 963. Similarly, words constitute defamation *per se* if they falsely impute to the plaintiff criminal activity. *Angio-Medical Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 272 (S.D.N.Y. 1989).

-14-

56.     As described in the preceding paragraphs, Defendant made false, libelous statements concerning Mr. Goldman, including but not limited to the following:

    a.  Defendant's text message to Thomas Aiello on November 17, 2017, in which Defendant wrote: "And now I have girls coming up thanking me bc of what he's done to their own friends.  Fuck that.  All I'm saying is im not standing up for a house that is condoning someone who ruined physically damaged my body and who are literally standing up for a **violent rapist**. [sic]" (***Exhibit B*** (emphasis added));

    b.  Defendant's text message to Dennis Kadric in May 2018, in which Defendant referred to Mr. Goldman as a "monster."

    c.  Defendant's post on the social media platform Facebook on June 4, 2018, in which Defendant wrote: "[d]uring the early hours of April 23, 2017 I was raped and sodomized.  I woke up in Delta Kappa Epsilon Fraternity in Alex Goldman's bed confused, bloody, bruised, with ripped clothing and splinter…My rapist has an internship with Bohler Engineering and will be graduating from a different college, New Jersey Institute of Technology. I have had multiple individuals that have approached me, expressed their knowledge of Alex Goldman's track record.  Alex Goldman is a rapist.  I write this post because this is not the first time Alex Goldman has raped someone and I want to make sure that it is the last." (***Exhibit C***);

    d.  Defendant's post on the social media platform LinkedIn on June 4, 2018, in which Defendant wrote: "[p]eople don't wake up one day and randomly decide they are going to violently rape and sodomize someone." (***Exhibit D***);

-15-

     e.   Defendant's post on the social media platform Facebook on June 5, 2018, in which she directly contacted Bohler Engineering and made false statements and subsequently celebrated its firing of Mr. Goldman (***Exhibit E***);

     f.   Defendant's post on the social media platform Facebook on June 6, 2018, in which she posted on the reviews section for NJIT: "[a] school that accepts recently expelled rapists, despite it being marked on their transcript." (***Exhibit F***);

57.     As described in the preceding paragraphs, the statements by Defendant were published to various third parties, including the **general public via social media platforms Facebook and LinkedIn.**

58.     Defendant had no authorization or applicable privilege at law that permitted her to make the aforementioned defamatory statements.

59.     Defendant's statements were defamatory *per se*, because "a false statement constitutes defamation per se when it charges another with a serious crime or tends to injure another in his or her trade, business, or profession." *Geraci v. Probst*, 61 A.D.3d 717, 718 (2d Dep't 2009); *see also Jacobus*, 55 Misc. 3d at 480 (citations omitted); *see also White*, 28 A.D.3d at 724.

60.     Defendants' statements were also defamatory *per se* because they falsely accused Plaintiff of sexual assault and rape, *e.g. D'Amico*, 120 A.D.3d at 963, and falsely imputed criminal activity to Plaintiff, *e.g.*, *Angio-Medical Corp.*, 720 F. Supp. at 272.

61.     Plaintiff is not required to establish harm and it is presumed because Defendant's statements were defamatory *per se*. *See Jacobus*, 55 Misc. 3d at 474.

62.     Defendant's statements have in fact caused harm to Mr. Goldman as he was fired from his summer internship with Bohler Engineering and he has suffered harm to his reputation.

63.     By way of examples, following Defendant's false statements and posts, numerous people have posted online posts that Mr. Goldman is a "rapist" and "should be off the streets." Based on Defendant's fabricated statements, these people falsely believe Mr. Goldman is a criminal.

64.     As a result of Defendant's wrongful conduct, Mr. Goldman has been damaged in an amount to be determined at trial, but not less than $5,000,000.00.

**AS FOR A SECOND CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**AND BUSINESS RELATIONS**

65.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs (1-64) as if set forth at length herein.

66.     Under New York law, a cause of action for tortious interference with prospective economic advantage or business relations requires the following elements: (1) that the plaintiff had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) that the defendant's interference caused injury to the relationship. *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003).

67.     The first element—the business relationship with a third party— may be met even if the interference is with a nonbinding relationship if it is shown "that defendant's conduct was not 'lawful' but more 'culpable'" *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004).  That is to say, if the relationship is nonbinding, i.e. not contractual, a criminal act or an independent tort will sufficiently sustain a claim for tortious interference with business relations. *Id.*

68.     The second element, the defendant's interference, may be met by showing the defendant's conduct was directed toward the third party to convince the third party not to enter into or maintain a business relationship with the plaintiff. *See, e.g.*, *Gym Door Repairs, Inc.*, 206

-17-

F. Supp. 3d, 869, 908 (S.D.N.Y. 2016) (citing *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997)).

69.     The third element requires a showing that the defendant acted with a wrongful purpose or employed wrongful means. *Gym Door Repairs, Inc.*, 206 F. Supp. 3d at 908 (citing *Carvel Corp. v. Noonan*, 785 N.Y.S.2d 359, 359 (2004)). The defendant's conduct must amount to a crime or an independent tort, except that, where the defendant engages in conduct "for the sole purpose of inflicting intentional harm on plaintiffs," then the wrongful means element of the test is satisfied. *Id.*

70.     An employment agreement that is terminable at-will can support a claim for tortious interference with business relations. *Collins v. Circa, Inc.*, 2015 NY Slip Op 30135(U) (Sup. Ct. N.Y. Cnty. 2015)(citing *Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183 (1980).

71.     As described in the preceding paragraphs, Mr. Goldman was previously a student at Syracuse University, is currently a student at NJIT, and had a summer internship with Bohler Engineering. Defendant specifically targeted these relationships, among others, in her harassing campaign in which she made wrongful, knowingly false statements designed to interfere with Mr. Goldman's business relationships.

72.     As described in the preceding paragraphs, Defendant knew of Mr. Goldman's business relationships with the aforementioned third parties and intentionally interfered with them. Defendant's communications to these third parties, including her false complaint to Syracuse University and her knowingly false statements directed to New Jersey Institute of Technology and Bohler Engineering, evidence a calculated purpose and wrongful intent to convince these third parties to cease their business relationships with Mr. Goldman. *See, e.g.*, *Gym Door Repairs, Inc.*, 206 F. Supp. 3d at 908.

73.     Specifically, *inter alia*, Defendant made a false complaint to Syracuse University that Mr. Goldman sexually assaulted her.  Further, in social media posts, Defendant claimed that Mr. Goldman is a "rapist."  Defendant targeted these communications to NJIT and Bohler, among others, in an attempt to damage the reputation of both Mr. Goldman and the third party—NJIT and Bohler—if the third party continued their business relationship.

74.     As described in the preceding paragraphs, Defendant's interference with Mr. Goldman's business relationships with Syracuse University, New Jersey Institute of Technology, and Bohler Engineering arose out of malice, and used dishonest, unfair, and improper means to accomplish the deprivation of economic opportunities.

75.     As described in the preceding paragraphs, Defendant acted with a wrongful purpose, as evidenced by the content of her communications, to provoke third parties to cease their business relationships with Mr. Goldman. *See, Id.*

76.     As described in the preceding paragraphs, Defendant employed wrongful means, including making knowingly false allegations for the purpose of interfering with Mr. Goldman's business relationships and prospective economic opportunities; in fact, her conduct rose to the level of the tort of defamation. *See id.*

77.     Further, as described in the preceding paragraphs, Defendant's wrongful conduct was "for the sole purpose of inflicting intentional harm on plaintiff." *Id.*

78.     Defendant's aforementioned wrongful conduct caused injury to Mr. Goldman's business relationships.   Defendant also damaged Mr. Goldman's prospective economic opportunities.

79.     As a result of Defendant's wrongful conduct, Mr. Goldman has been damaged in an amount to be determined at trial, but not less than $5,000,000.00.

-19-

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff's prayer for judgment and relief are as follows:

    a.  A temporary, preliminary and permanent injunction against Defendant, enjoining them from committing the wrongdoing against Plaintiff complained of in this action;

    b.  An award of actual, compensatory and consequential damages against Defendant, jointly and severally, for all damages Plaintiff sustained as a result Defendant's conduct, in an amount to be determined at trial, not less than $5,000,000.00, together with pre-judgment and post-judgment interest thereon;

    c.  An award of punitive damages against Defendant, jointly and severally, in an amount to be determined at trial, not less than $1,000,000.00;

    d.  An award of reasonable attorney's fees;

    e.  An award of the costs of this action; and

    f.  Such other and further relief as this Court may deem just and proper.

*[remainder of page intentionally blank]*

Dated:  New York, New York
        June 25, 2018

                                    Respectfully submitted,


                                    GOTTLIEB & JANEY LLP


                                    By:
                                    Derrelle M. Janey, Esq.
                                    Seth J. Zuckerman, Esq.

                                    Gottlieb & Janey LLP
                                    Trinity Building
                                    111 Broadway, Suite 701
                                    New York, NY 10006
                                    Tel.: (212) 566-7766
                                    Fax: (212) 374-1506
                                    Email: djaney@gottliebjaney.com
                                    Email: szuckerman@gottliebjaney.com
                                    *Attorneys for Plaintiff Alex Goldman*